Mr. Neiman. Good morning, Your Honors. May it please the Court. My name is Nate Neiman. I'm here on behalf of Mr. Sheridan, who's the appellant in this case and the defendant in the proceedings below. We are asking for the defendant's conviction and sentence to be reversed for reasons stated in our brief and the reasons that I'll argue here at oral argument. The central issue of this appeal is whether somebody can be convicted for concealment money laundering when they merely acted as a conduit through which money flowed from one drug buyer to one drug dealer. And the question has to be resolved, I think, first by looking at the statutory language under 18 U.S.C. 1956. The concealment element that the government must prove beyond a reasonable doubt requires that the defendant had to know that the transaction was designed in whole or in part to disguise the nature, location, source, ownership, or control of the proceeds. And the question as it pertains to this case is whether my client, who operated a bank account in California in his name and received deposits from a drug buyer in the Quad Cities and then withdrew those deposits and gave them to a drug dealer in Los Angeles, who turned around, bought marijuana, and sold it to the buyer in the Quad Cities, whether he concealed the nature, location, source, ownership, or control of the money that was going through his bank account. The central case or the most controlling case that would dictate how this court should reach this decision would be its prior case in United States v. Esterman, which is a 2003 case. And Esterman goes into quite a bit of detail and background as to what constitutes concealment money laundering. And it first starts by describing the process of money laundering. The first step is that the criminal or illegal money is placed in a legitimate enterprise. Then the funds are layered to obscure the source. And then the third step and final step is that the newly laundered funds are integrated into legitimate financial world in the form of legitimate financial instruments. And it gives a list of instruments that our financial world uses on a day-to-day basis. In this case, the money that was placed into Mr. Sheridan's account was never placed into any legitimate enterprise. It was placed into a bank account that was held in the defendant's name and was not placed in any sort of business like a ticket service or a restaurant that Esterman describes. The funds were not layered to obscure the source. The deposits were simply made from branches in the Quad Cities to Mr. Sheridan's accounts, and they were withdrawn from Mr. Sheridan's accounts, given to the drug dealer in California who used that money to buy drugs. Thirdly, and most importantly, I think, the funds were never layered. They were never integrated into any legitimate financial instrument. It was just money that was placed into one bank account, taken out of the bank account, given to a drug dealer in California who then bought drugs with the money and then sent it back to the Quad Cities. At no point in time did any of the funds that were placed into the bank account become legitimized. Esterman sets out a two-part test for determining whether money laundering occurs. The first part is that there must be some separation between the initial transaction from which the illegal proceeds were derived and further transactions designed to conceal the source of the proceeds. The second is that mere transfer and spending of funds is not enough to constitute money laundering under the concealment theory. Now, as to the first factor, there was no separation between the initial transaction from which the illegal proceeds were derived, and that is because this was all one looping transaction. This occurred many, many times over a course of many months, and the district court in sentencing alluded to that fact, that Mr. Sheridan's role was not to legitimize the funds through some other separate transaction, but merely to facilitate the transfer of money from the Quad Cities to Los Angeles, so that the money could be used to buy marijuana to send back to the Quad Cities. As to the second factor, the mere transfer and spending of funds, that's exactly what we have here. The defendant's role was merely to accept the funds into his account, withdraw them open and notoriously through the local bank branches in Los Angeles in full view of the video camera, signing his real name every time, and then giving them to what turned out to be his cousin in Los Angeles. So, Esterman talks about the transformation of illegal funds to some clean and usable form through the separate transaction. And I think that that is really the most important theme, is that the funds were never converted into any clean or usable form. They were always, the funds that were deposited into his account were destined to buy drugs, and the funds that were withdrawn from his account were similarly destined to buy drugs. At no point were any of the funds diverted into any legitimate enterprise from which he was able to pay taxes, convert into some sort of legitimate financial instrument, or otherwise clean these funds. The fact of the matter is that the money always stays dirty. And if the government's theory holds true, or if this court is to accept the government's theory, then anyone who transfers funds, even by hand, from one drug purchaser to another, in other words, some sort of middleman that facilitates a financial transaction between two parties, would be guilty of concealment money laundering. The only thing that makes this any more sophisticated than hand-to-hand cash transactions is the fact that he used bank accounts. But the record shows that that was not a terribly sophisticated means of transferring money across the country, and that, in fact, most of the time that this is going on, the parties that are involved in this are trying to stay one step ahead of the bank shutting their accounts down, which is really what this is about. It's not about concealing the nature, the source, the ownership, control of the proceeds. It's about being able to continue to transfer money across the country in the most expedient way. And the most expedient way to do that is through bank accounts. It's the mere transfer of funds from one place to another. And that's supported by the record with the fact that at the beginning of this operation, they used to transport money back and forth through the U.S. mail in cash. But then that became too slow, so they started doing it with the banks. The banks caught on and started closing down accounts, so they had to open more accounts, et cetera. These funds were never clean. We know the nature of the funds. The detective who was looking at the case and trying to follow the money, as he stated, was able to discern exactly what these monies were, where they were going, their location, where the source was, who owned them, who controlled them. All of this was easily identifiable. This is not a complicated layering scheme that is used to conceal what is going on. I see that my time is running up. Unless the court has any other questions, I will save the rest for later. Certainly, counsel. Thank you. Mr. Baldwin. Thank you, Your Honor. May it please the court. Jason Baldwin on behalf of the United States. The defendant admits he's a third party to financial transactions between the drug dealer and the drug buyer. The only reason he was a third party to these transactions was to conceal who was really involved in the transactions. There's no reason for him to get involved but to conceal. And we believe all of the evidence at trial supports the jury's conclusion that he was, in these 32 substantive counts and with his agreement with his cousin, guilty of the charges alleged against him. Once the cash was withdrawn from his account, my opposing counsel says it was never clean. Well, it's just cash. It was criminally derived. It's true it wasn't clean in that manner, but it was cash that could be used by the drug dealer in California with impunity at that point. And the fact that they didn't conceal it very well is true of every defendant who is convicted of money laundering through the concealment prong. Only when you're caught, you haven't concealed it very well. That's the nature of this case. Are you conceding that the DEA and the FBI lack any equivalent of Sherlock Holmes and that sophisticated money launderers are therefore never caught by our bumbling cops? No, I'm not saying that. No, I'm not saying that. I'm just saying that it doesn't have to be sophisticated for it to be concealment. That was the attempt here. I think maybe the best use of the rest of my time would be to make sure that there is any questions by the court they are answered. Seeing none, we will ask that the judgment be affirmed. Certainly, counsel. Anything further, Mr. Nieman? Not much to reply to. I just wanted to touch on one statement that opposing counsel made, and that was that the cash that the drug dealer in California received, he was able to use with impunity. Well, the cash never transformed from the Quad Cities to California. He would be able to use that cash with impunity whether it went through Mr. Sheridan's account or not. So the fact that it went through Mr. Sheridan's account doesn't clean it any more than what it already was. So unless the court has any other questions, I will conclude. Thank you very much, counsel. And, Mr. Nieman, we appreciate your willingness to accept the appointment in this case. Thank you, Your Honor.